OPINION OF THE COURT
Deborah H. Karalunas, J.
By notice of motion dated December 3, 2009, defendant The Hayner Hoyt Corporation sought an order declaring that a March 4, 2008 mortgage increase, modification and spreader agreement is subordinate to its mechanic’s lien of $3,238,106 filed on October 31, 2008.
By notice of cross motion dated January 19, 2010, defendant Syracuse Merit Electric, a division of O’Connell Electric Company, Inc., requested summary judgment directing that plaintiffs mortgage and the Hayner Hoyt mechanic’s lien are subordinate to the Syracuse Merit Electric mechanic’s lien of $731,477.33 filed on December 3, 2008. Syracuse Merit Electric also sought attorneys fees and costs.
By notice of cross motion dated January 20, 2010, defendant The Pike Company, Inc. sought a declaration that the March 4, 2008 mortgage increase, modification and spreader agreement and all other mechanic’s liens involved in this action are subordinate to Pike Company’s mechanic’s lien of $47,797.63 filed on September 18, 2008.
I. Background
By summons and verified complaint dated December 4, 2008, plaintiff Perfect Provident Fund Ltd. (now known as Altshuler Shaham Provident Funds, Ltd.) commenced a foreclosure action against defendants GML Tower and others. The affected prop *477 erties are the 15-floor tower at 101-131 Onondaga Street in Syracuse that was formerly part of the Hotel Syracuse and the five-floor commercial building at 449-453 Salina Street in Syracuse that was formerly a department store. Defendants GML Tower LLC, GML Addis LLC and Ameris Holdings Ltd. (collectively, GML) are parties to a $10 million note and mortgage concerning the properties.
Defendant Levy Kushnir is a partial guarantor on the loans. With one exception, the remaining defendants are contractors who filed mechanic’s liens against the 101-131 Onondaga Street property.
The following time line is not disputed.
On September 8, 2005 a purchase-money mortgage for $7 million was recorded in connection with the properties. GML was the borrower and First Bank of Oak Park was the lender.
On November 16, 2006 a modification to the above mortgage was recorded.
On March 29, 2007, plaintiff and GML entered a loan agreement in which plaintiff agreed to loan GML $10 million. The contract at section 4.4 required $5.5 million be used to pay off the existing loan with the successor to First Bank of Oak Park. The remaining $4.5 million was to be used for construction of improvements. This document was not filed. Characterization of this document is central to the parties’ dispute.
On May 1, 2007, plaintiff and GML entered a memorandum of understanding concerning the March 29, 2007 loan agreement. This document was not filed.
On May 2, 2007, plaintiff paid $5.5 million to the successor of First Bank of Oak Park and received an assignment of the original September 8, 2005 mortgage. (Lowenstein aff Iff 12-13.) Plaintiff recorded the assignment on May 3, 2007.
On May 3, 2007, plaintiff recorded a mortgage extension and modification agreement between it and GML. The document, among other things, modified the principal amount of the 2005 purchase-money mortgage to $5.5 million.
Between May 24, 2007 and February 21, 2008, plaintiff advanced $2.5 million to GML in connection with the project. (Lowenstein aff 1i 17.)
On March 4, 2008, plaintiff and GML entered amendment no. 1 to their March 29, 2007 loan agreement. This document was not filed. On March 6, 2008, plaintiff advanced $2 million to GML. (Lowenstein aff If 19.)
*478 On March 7, 2008, plaintiff filed its mortgage increase, modification and spreader agreement with GML to secure its $10 million loan. This is the document to which the foreclosure complaint refers.
Movant Hayner Hoyt began work on the project on July 16, 2007. It filed a mechanic’s lien for $3,238,106 on October 31, 2008. Cross-movant Syracuse Merit Electric began work on the project on January 20, 2008 as a subcontractor of Hayner Hoyt. It filed a mechanic’s lien for $731,477.33 on December 3, 2008. Cross-movant Pike Company first worked on the project on September 4, 2007 and filed a mechanic’s lien of $47,797.63 on September 18, 2008.
II. Discussion
Hayner Hoyt and Pike Company argue that plaintiff’s mortgage is subordinate to their mechanic’s liens because plaintiff failed to file the March 29, 2007 loan agreement in violation of section 22 of the Lien Law. Syracuse Merit Electric argues that plaintiffs mortgage is subordinate to its mechanic’s lien because plaintiff violated section 13 (2) and (3) of the Lien Law. Hayner Hoyt later adopted this argument as well. Plaintiff opposed the motions.
A. Section 22 of the Lien Law
The parties do not dispute the meaning of section 22 of the Lien Law, which requires a “building loan contract either with or without the sale of land,” as well as any modification to the building loan contract, to be filed in the county clerk’s office. The statute further provides that “[i]f not so filed the interest of each party to such contract in the real property affected thereby, is subject to the lien and claim of a person who shall thereafter file a notice of lien under this chapter.” (Lien Law §22.)
The purpose of section 22 is “to readily enable a contractor to learn exactly what sum the loan in fact made available to the owner of the real estate for the project.” (Nanuet Natl. Bank v Eckerson Terrace, 47 NY2d 243, 247 [1979]; see also Howard Sav. Bank v Lefcon Partnership, 209 AD2d 473, 476 [2d Dept 1994].)
If section 22 applies to the March 29, 2007 loan agreement that plaintiff never filed, then plaintiffs mortgage is subordinate to the liens subsequently filed by those who provided services and materials for the project. (See Howard Sav. Bank, 209 AD2d at 475; see also HNC Realty Co. v Bay View Towers Apts., 64 AD2d 417, 420 [2d Dept 1978].)
*479 The dispute concerning section 22’s application hinges on whether the March 29, 2007 loan agreement is a “building loan contract” as defined by statute:
“The term ‘building loan contract,’ when used in this chapter, means a contract whereby a party thereto, in this chapter termed ‘lender,’ in consideration of the express promise of an owner to make an improvement upon real property, agrees to make advances to or for the account of such owner to be secured by a mortgage on such real property, whether such advances represent moneys to be loaned or represent moneys to be paid in purchasing from or in selling for such owner bonds or certificates secured by such mortgage upon such real property, providing, however, nothing herein contdined shall be deemed to construe as a building loan contract a preliminary application for a building loan made by such owner and accepted by such lender if, pursuant to such application and acceptance, a building loan contract is thereafter entered into between the owner and the lender and filed as provided in section twenty-two of this chapter.” (Lien Law § 2 [13].)
Courts interpreting this definition characterize a building loan contract as an agreement to provide a loan for the purpose of erecting a building where the funds are advanced in installments as construction progresses. (Alden State Bank v Sunrise Bldrs., Inc., 48 AD3d 1162, 1164 [4th Dept 2008]; Pawling Sav. Bank v Hunt Props., 225 AD2d 678, 679 [2d Dept 1996]; Finest Invs. v Security Trust Co. of Rochester, 96 AD2d 227, 229 [4th Dept 1983].) A loan agreement is not a building loan agreement where funds are used “merely to pay existing mortgages and bonuses to the lender for making the loan.” (Pawling Sav. Bank, 225 AD2d at 679.)
Related to the definition of “building loan contract” is the statutory definition of a “building loan mortgage”: “The term ‘building loan mortgage,’ when used in this chapter, means a mortgage made pursuant to a building loan contract and includes an agreement wherein and whereby a building loan mortgage is consolidated with existing mortgages so as to constitute one lien upon the mortgaged property.” (Lien Law § 2 [14].)
The March 29, 2007 loan agreement on its face comports with the definition of a building loan contract. It is between a lender *480 and the owner of real property. In the agreement, the owner makes an express promise to make improvements on the property. (See e.g. Mar. 29, 2007 loan agreement §§ 4.4.2, 6.1.1, 7.1.) The lender agrees to make periodic advances of $4.5 million to fund the improvements. (See id. § 7.) The lender was to be kept apprised of construction progress. (See id. §§ 7.1.3, 8.) The agreement contemplates that the $10 million loan will be secured by a mortgage on real property. (See id. § 3.) In a miscellaneous provision, the agreement even labels itself a “construction loan transaction[ ]” in which “construction financing is being provided by Lender.” (Id. § 11.9.)
Plaintiff argues that the March 29, 2007 loan agreement nonetheless is not a building loan contract because its advances of $4.5 million for construction were unsecured. According to plaintiff, “Section 22 only requires a building loan contract to be filed when future advances are required to be made thereunder and a mortgage securing those future advances is recorded prior to the funding [of] those future advances.” (Plaintiffs mem at 7.)
The court disagrees. Plaintiff is collapsing the terms “building loan contract” and “building loan mortgage.” Section 22’s filing requirement concerns only a building loan contract. While section 22 requires that the building loan contract be filed “on or before the date of recording the building loan mortgage made pursuant thereto,” it does not require filing of the building loan mortgage. (Lien Law § 22.) Similarly, the definition of a building loan contract mentions construction advances “to be secured” by a mortgage on the property, but it does not require a contemporaneous mortgage. (Lien Law § 2 [13].)
Certainly, in most instances a lender will file the building loan mortgage at or about the same time it files the building loan contract to protect its interests. But the purpose of section 22 is different. As noted previously, the purpose of section 22 is to inform a contractor what sum of money is available under the loan for the project. It is not, as plaintiff asserts, to establish lien priority for the construction disbursements. The loss of priority that section 22 imposes is a “subordination penalty” for failing to provide contractors with required information. (Nanuet Natl. Bank, 47 NY2d at 248.)
Plaintiff also argues that it may rely upon the original purchase-money mortgage filed on September 8, 2005 to establish its priority with respect to the $5.5 million used to purchase the property. There is no dispute, however, that plaintiffs fore *481 closure action rests on the mortgage increase, modification and spreader agreement filed on March 7, 2008. Under the facts of this case, the mortgage filed on March 7, 2008 was a building loan mortgage made pursuant to the March 29, 2007 loan agreement, which was an unrecorded building loan contract. The court rejects plaintiffs contention that the mortgage filed on March 7, 2008 did not consolidate existing mortgages to constitute one lien upon the property. Even if the word “consolidate” does not appear in the document’s title, the document itself notes that plaintiff acquired the mortgage to First Bank of Oak Park, plaintiff and GML then engaged in a series of transactions, and the parties ultimately established one lien upon the property.
Finally, plaintiff contends that it is entitled to priority with respect to the $5.5 million used to purchase real property. Based on section 22’s language describing a building loan contract “either with or without the sale of land,” the court finds that “if a lender fails to comply with the requirements of the Lien Law, its entire mortgage, including that part securing loan proceeds advanced for the purchase of the property, would become subordinate to any subsequently filed mechanic’s liens.” (Atlantic Bank of N.Y. v Forrest House Holding Co., 234 AD2d 491, 492 [2d Dept 1996]; see also HNC Realty Co. v Golan Hgts. Devs., 79 Misc 2d 696, 702-703 [Sup Ct, Rockland County 1974].) In Nanuet Natl. Bank, the Court of Appeals also subjected a bank’s entire interest in a building loan mortgage to that of the mechanic’s lienors. (47 NY2d at 248-249.) The court declines to follow Yankee Bank for Fin. & Sav., FSB v Task Assoc., Inc. (731 F Supp 64, 71 n 2 [ND NY 1990]), which gave priority to the lender for loan proceeds used to purchase real property on the erroneous assumption that building loan contracts and building loan mortgages only concern improvements on real property. Section 22 governs building loan contracts that involve both improvements and the sale of land.
Consequently, plaintiffs failure to file the March 29, 2007 loan agreement was in violation of section 22. The mortgage filed on March 7, 2008 that plaintiff seeks to foreclose is subordinate to the mechanic’s liens.
B. Section 13 of the Lien Law and Priority among Lienors
Syracuse Merit Electric argues that plaintiffs mortgage is subordinate to its mechanic’s lien because plaintiff violated section 13 (2) and (3) of the Lien Law. In light of the court’s ruling with respect to section 22, it does not address this argument.
*482 The various lienors also dispute the priority of the liens among themselves. Syracuse Merit argues correctly that its lien is superior to that of Hayner Hoyt pursuant to Lien Law § 56 because it was a subcontractor to Hayner Hoyt as general contractor.
Pike Company argues that its lien is superior to all others pursuant to section 13 because it performed labor. The court finds that Pike Company’s lien is on a parity with those of other contractors because there is no evidence its lien was for daily or weekly wages of laborers. (Lien Law § 13 [1].)
III. Conclusion
For the foregoing reasons, the motion of Hayner Hoyt is granted. The cross motion of Syracuse Merit Electric is granted. Its request for attorneys fees and costs, however, is denied. The cross motion of Pike Company is granted in part because its lien has priority over plaintiffs mortgage. Counsel for Hayner Hoyt is directed to prepare a proposed order on notice in accordance with this decision.